IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On Briefs January 24, 2008

# STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. LEIGH ANN MCALISTER, ET AL.

**A Direct Appeal from the Juvenile Court for Shelby County**
**No. R5586     The Honorable Herbert Lane, Special Judge**

---

**No. W2007-00171-COA-R3-PT - Filed February 26, 2008**

---

This is a termination of parental rights case. Mother/Appellant appeals the Order of the Shelby County Juvenile Court terminating her parental rights to her two minor children. Specifically, Appellant asserts that the grounds of persistence of conditions and failure to substantially comply with the permanency plans are not supported by clear and convincing evidence in the record, and that termination of her parental rights is not in the best interests of the children. Because we find clear and convincing evidence in the record to support termination on the grounds of failure to substantially comply with the permanency plans, and clear and convincing evidence that termination is in the best interests of the children, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, J., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

W. Ray Glasgow of Memphis, Tennessee for Appellant, Leigh Ann McAlister

Robert E. Cooper, Jr., Attorney General and Reporter; Douglas Earl Dimond, Senior Counsel, for Appellee, Tennessee Department of Children's Services

**OPINION**

Leigh Ann McAlister ("Mother," or "Appellant") is the biological parent of K.C. (d.o.b. 2/15/99) and S.M.C. (d.o.b. 7/9/01) (together with K.C., the "Children"). Keith Capps is the biological father of the Children. Mr. Capp's parental rights were also terminated by the trial court; however, he does not appeal that ruling. Consequently, Mother is the sole Appellant herein.

On May 27, 2005, the State of Tennessee, Department of Children's Services ("DCS," or "Appellee") filed a dependency and neglect petition in the Juvenile Court of Shelby County. According to the Petition, DCS became involved in this case in October of 2004, when they received

a referral alleging that the Children were being exposed to drugs and drug use by both biological parents. During the pendency of DCS's investigation, Ms. McAlister was incarcerated for theft, and the Children were placed in the physical custody of their maternal grandmother, Priscilla Ritchey, and Mr. Capps. As a result of a domestic issue between the grandmother and Mr. Capps, Mr. Capps was arrested for an outstanding warrant.

On March 9, 2005, DCS received a second referral, which alleged that the Children were being exposed to their Mother's drug use. It was alleged that Mother was living in a "dope house," and that she was injecting prescription drugs. During DCS's investigation, it was discovered that the Children were currently residing in the home of their maternal uncle, Darryl McAlister, who was a reported drug user. The dependency and neglect petition indicates that, as of May 24, 2005, Ms. McAlister was in St. Francis Hospital due to a "blood infection and blisters all over her body from IV drug use." In its Petition, DCS asserts that there is no known adequate placement for the Children, and that, following reasonable efforts to prevent removal, DCS requests custody of the Children.

On May 27, 2005, the trial court entered a Protective Custody Order, in which the court found that the Children should remain in DCS's custody. On June 21, 2005, following a preliminary hearing, the Juvenile Court Referee entered findings and recommendations, finding that the Children "should remain in the custody of [DCS] pending results from drug screens of Leigh Ann McAlister, [and] Darryl McAlister...." The Referee's findings were confirmed by the Special Judge.

On June 16, 2005, the initial permanency plans were drafted and approved by DCS caseworker Denise Fair and supervisor Serita Bumpus. These plans set a goal of parent-child reunification. The plans set weekly visits between Ms. McAlister and the Children, with Ms. McAlister being required to notify DCS twenty-four hours in advance should she be unable to attend any visits. Ms. McAlister was also required to have a drug assessment, and to explore options other than narcotics for her alleged back pain. She was required to maintain contact with DCS as to any changes and/or needs, and was to obtain a domestic violence assessment. Ms. McAlister agreed to the plans and signed them.

On November 18, 2005, Pyramid Recovery Center performed an alcohol and drug assessment of Ms. McAlister. The record reveals that, during this assessment, Ms. McAlister reported mental health issues (i.e. anxiety and depression), recent drug use (including crack cocaine, crystal methamphetamine, and heroine), and other undated drug use (including dilaudid, percocet, hydrocodone, and soma). Ms. McAlister also reported a history of criminal/legal problems and domestic violence.

On January 11, 2006, DCS developed a second set of Permanency Plans for the Children. These plans add adoption as a goal in addition to reunification. Under this second set of plans, Ms. McAlister was required to obtain a drug assessment, to inform DCS of any changes or needs, and to obtain a domestic violence assessment. Ms. McAlister was also required to successfully complete alcohol and drug counseling and parenting classes, and to pass random drug screens. In addition,

Ms. McAlister was required to contact shelters and housing authorities in order to obtain stable housing for herself and the Children, and to seek employment through temporary agencies in order to maintain financial stability. Although Ms. McAlister did not sign these plans, the family's social worker testified that the plans were sent to Ms. McAlister, that she had seen the plans, and that she was aware of her requirements thereunder.[1] On January 19, 2006, DCS caseworker Denise Fair filed an Affidavit of Reasonable Efforts. On January 24, 2006, the second set of plans was approved by the Juvenile Court Referee. Both parents were contacted after the plans were revised, and both parents' objections are noted. On February 3, 2006, Court Appointed Special Advocate Pamela Ross was appointed to investigate and file a written report.

On June 27, 2006, DCS filed its Petition to Terminate Parental Rights, which Petition reads, in relevant part, as follows:

> 3. Respondent, Leigh Ann McAlister...[has] abandoned the children in that [she has] willfully failed to make any contribution whatsoever toward the support of the children for four (4) consecutive months immediately preceding the filing of this petition despite being able-bodied and capable of employment.
>
> IV
>
> 1. These children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of Respondents; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to Respondents in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.
>
> 2. Despite frequent explanations of the statement of responsibilities set out in periodic permanency plans prepared for the Respondent[], Leigh Ann McAlister..., [she has] failed to comply in a substantial manner with those reasonable responsibilities related to remedying the conditions that necessitate foster care placement.
>
> *                    *                    *

---

[1] Ms. McAlister's testimony at the hearing confirms that she knew and understood what was required of her under these plans.

4. An initial permanency plan was developed at a staffing on June 16, 2005, with subsequent plans developed and ratified at regular intervals thereafter. Said plans required that Respondent[], Leigh Ann McAlister...should:

    a. Complete alcohol and drug treatment;
    b. Take random drug screens;
    c. Take parenting classes;
    d. Maintain stable housing; and
    e. Maintain stable employment;

5. Respondent[], Leigh Ann McAlister...[has] completed none of the permanency plan responsibilities.

VI

It is in the best interest of [S.M.C.] and [K.C.] and the public that this proceeding be brought, that all of the parental rights of Respondents, Leigh Ann McAlister and Keith Capps to these children be forever terminated, and that the complete custody, control and guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place the children for adoption and to consent to such adoption *in loco parentis*.

On July 26, 2006, a guardian *ad litem* was appointed for the Children. Thereafter, on July 31, 2006, the Children's maternal grandmother, Priscilla Ritchey filed a "Petition to Modify Order," seeking custody of her grandchildren. DCS caseworker Eleanor Jackson filed an Affidavit of Reasonable Efforts on November 7, 2006. The matter proceeding to trial on October 12 and November 30, 2006. In a purported final order, entered on January 3, 2007, the trial court terminated Ms. McAlister's parental rights. As noted above, only Ms. McAlister appealed. Certain defects in the January 3, 2007 Order were cured and the Order was re-filed on April 25, 2007. The "Order Terminating Parental Rights and Final Decree of Guardianship" (the"Final Order") reads, in pertinent part, as follows:

FINDINGS OF FACT

As required by Tenn. Code Ann. § 36-1-113(k), the Court makes the following findings of fact by clear and convincing evidence based on the testimony of the witness for DCS, trial exhibits, statements of counsel and the entire record in this cause. The children...were properly removed by Order of the Juvenile Court of Memphis and Shelby County, Tennessee on May 27, 2005 based

upon findings of dependen[cy] and neglect, to wit, that the Respondent mother, Leigh Ann McAlister was hospitalized as a result of drug use.... Further, said children have been in continuous foster care since that date.

(1) Reasonable efforts to prevent the removal of the children was not required because Respondent mother was in the hospital for drug usage.

\*                                    \*                                    \*

(5) These children have been removed by Order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of Respondents; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to Respondents in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

\*                                    \*                                    \*

(7) [S.M.C.] and [K.C.] came into custody upon a finding of dependency and neglect, due to drug exposure and lack of stable housing.

(8) There has been substantial noncompliance by the Respondent[], Leigh Ann McAlister...with the statement of responsibilities in a permanency plan or plan of care. The plan required that Respondent[], should:

    a. Complete alcohol and drug treatment;
    b. Take random drug screens;
    c. Take parenting classes;
    d. Maintain stable housing and
    e. Maintain stable employment.

(9) Respondent[], Leigh Ann McAlister...[has] completed none of [her] requirements.

## CONCLUSIONS OF LAW

-5-

         \*                     \*                      \*

       In the case at bar, the Court concluded that there is clear and convincing evidence to support grounds for termination of the parental rights of Respondents Lee Ann McAlister and Keith Capps in that the Respondents ha[ve] abandoned the children in violation of Tenn. Code Ann. 36-1-113(g)(1).

       Further, the Court concluded that the children have been removed from the home by order of a Court for a period of six (6) months pursuant to Tenn. Code Ann. 36-1-113(g)(3)(A).

       The Court further concluded that termination of the parental rights of the Respondents is in the best interest of the children. Tenn. Code Ann. 36-1-113(i).

On appeal, Ms. McAlister raises four issues for review, as set out in her brief:

> I. Whether findings of fact as set forth by the trial court establish that the elements required to terminate a biological parent's parental rights were proven by clear and convincing evidence.
>
> II. Whether the trial court properly heard and sustained the petition for termination of parental rights absent an adjudicatory hearing to determine whether the allegations of dependency and neglect were true.
>
> III. Whether the trial court erred in overruling defense objections to unverified drug test results as inadmissible hearsay.
>
> IV. Whether the trial court erred in ruling on the petition to terminate parental rights as a petition to modify custody of the maternal grandmother was pending.

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp*., 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will

-6-

be given great weight by the appellate court. ***See id.***; ***see also Walton v. Young***, 950 S.W.2d 956, 959 (Tenn.1997).

T.C.A. § 36-1-113(c) (Supp. 2007) governs termination of parental rights and requires that such termination be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interest of the child.

The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties ." ***M.L.B. v. S.L.J.***, 519 U.S. 102, 119 (1996) (quoting ***Santosky v. Kramer***, 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." ***Id***. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. ***See O'Daniel v. Messier***, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (rev'd on other grounds, ***In re: Swanson***, 2 S.W.3d 180 (Tenn.1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. ***See Santosky***, 455 U.S. at 769; ***O'Daniel***, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. ***See*** T.C.A. § 36-1-113(c)(1) (2005); ***State Dep't of Human Servs. v. Defriece***, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. ***O'Daniel v. Messier***, 905 S.W.2d 182, 188 (Tenn.Ct.App.1995); ***Brandon v. Wright***, 838 S.W.2d 532, 536 (Tenn.Ct.App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); ***O'Daniel v. Messier***, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. ***O'Daniel v. Messier***, 905 S.W.2d at 188; ***Wiltcher v. Bradley***, 708 S.W .2d 407, 411 (Tenn.Ct.App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. ***Lettner v. Plummer***, 559 S.W.2d 785, 787 (Tenn.1977); ***Goldsmith v. Roberts***, 622 S.W.2d 438, 441 (Tenn.Ct.App.1981); ***Brandon v. Wright***, 838 S.W.2d at 536.

## Grounds for Termination

The trial court terminated Ms. McAlister's parental rights on the grounds of persistence of conditions, and failure to substantially comply with the requirements of the permanency plans. These grounds are codified at T.C.A. § 36-1-113(g)(Supp. 2007):

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan....
>
> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> >
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

As a preliminary matter, Ms. McAlister asserts that the trial court erred in its reliance upon the grounds of persistence of conditions in terminating her parental rights. Specifically, Ms. McAlister argues that there was no initial finding of dependency and neglect, or abuse in this case. Turning to the record, the "Protective Custody Order," entered on May 27, 2004 does not set a preliminary hearing on the dependency and neglect petition filed by DCS, nor does this order contain a specific finding of dependency and neglect. As noted by Ms. McAlister in her brief, only the permanency plans reference an alleged adjudication and finding of dependency and neglect. Furthermore, the June 21, 2005 "Findings and Recommendations of Referee" references a "preliminary hearing." However, there is no transcript or statement of the evidence of any adjudicatory hearing, nor does this record contain an order, or other documentation, from which we can conclude that the alleged dependency and neglect was actually adjudicated. In short, this record contains no express judicial finding of dependency and neglect, or abuse. In *In Re Audrey S*, 182 S.W.3d 838 (Tenn. Ct. App.), perm. to appeal denied (Tenn. Nov. 7, 2005), this Court held that, "based upon the statutory text and its historical development, [] Tenn. Code Ann. § 36-1-113(g)(3) [grounds of persistence of conditions, *see supra*] applies as a ground for termination of parental

-8-

rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." Based upon our review, as discussed above, there is no such finding in this case. Consequently, the trial court's reliance upon the grounds of persistence of conditions was incorrect.

However, as set out above, Ms. McAlister's parental rights were terminated based upon a finding of both persistence of conditions and failure to substantially comply with the requirements of the permanency plans. If there is clear and convincing evidence in the record to support the trial court's finding that Ms. McAlister failed to substantially comply with the permanency plans, and clear and convincing evidence to support the trial court's finding that termination of Ms. McAlister's parental rights is in the best interests of these Children, this Court will affirm the Final Order, absent other error. T.C.A. § 36-1-113(c).

As set out above, the permanency plans requires five (5) things of Ms. McAlister: (1) alcohol and drug treatment, (2) random drug screens, (3) parenting classes, (4) procurement of stable housing, and (5) procurement of stable employment. From our review of the record, it appears that Ms. McAlister's protracted drug use has stymied her ability to properly care for these Children. Specifically, the use of drugs has negated any possibility for true and lasting stability in Ms. McAlister's life. Despite her protestations that she loves these Children more than she loves drugs, the facts suggest otherwise. The record indicates that, from the May 2005 removal of the children into DCS custody until the filing of the petition to terminate her parental rights in June 2006, Ms. McAlister did little or nothing toward accomplishing the goals set out in the permanency plans. It was not until the petition was filed that Ms. McAlister seemed to find motivation to work toward the specific goals outlined in those plans. Because this Court is to look at the period prior to filing of the petition to terminate parental rights, the record clearly and convincingly supports a finding that Ms. McAlister was in substantial noncompliance with the permanency plans during the relevant period.

At the October 12, 2006 hearing, evidence was adduced that, since the filing of the petition to terminate parental rights, Ms. McAlister was, in fact, making some progress with her requirements under the permanency plans. Specifically, she was enrolled in a drug treatment facility, where she was being given methadone in order to break her addiction to heroine. Furthermore, she was attending some of the required classes. Because there appeared to be some progress, the trial court, in a act of leniency and opportunity for Ms. McAlister, carried the hearing over from October 12, 2006 until November 30, 2006 in order to give Ms. McAlister yet another chance to show some sustained effort toward compliance with the requirements of the plan. Before the hearing continued on November 30, the trial court ordered Ms. McAlister to submit to random drug screens, and to provide proof of employment. The court also ordered DCS to visit the house where Ms. McAlister was living with her alleged fiancé, Ronnie Williams.

At the hearing on Thursday, October 12, 2006, Ms. McAlister testified that she had been hired by Ruby Tuesday's, and that her first day on the job was to be the following day, Friday, October 13, 2006. At the November 30, 2006 hearing, the testimony was that Ms. McAlister had

not, in fact, gone to work at Ruby Tuesday's until October 31. Moreover, she had only worked that one day. As of the November 30, 2006 hearing, Ms. McAlister was not employed, nor could she provide any reason why she had not been working all along. At the October 12, 2006 hearing, Ms. McAlister also testified that she had prepared the Children's rooms in the house rented by Mr. Williams. Although Ms. McAlister is listed as an "occupant" on Mr. Williams' lease, she is not the leaseholder on this property. Nonetheless, Ms. McAlister told the court that she had painted the Children's rooms, had put up borders, and had purchased beds and toys. Eleanor Jackson, the DCS case manager assigned to make the home visit, testified that the rooms were not ready for the Children to occupy. The photos taken, and admitted into evidence, show K.C.'s room has been painted; however, S.M.C.'s room is not painted, or otherwise decorated and furnished as Ms. McAlister testified at the October 12 hearing. Although we concede that these rooms could be readied in short order, what concerns this Court is the fact that Ms. McAlister was not forthright with the trial court in her October 12 testimony. These inconsistencies, untruths, and embellishments in her testimony damage Ms. McAlister's credibility, and give this Court pause as to her overall truthfulness.

More concerning are the results of Ms. McAlister's drug screens during the time between hearings. During this time, Ms. McAlister was asked for five screens. The first four screens (taken on October 12, October 18, October 23, and November 7) showed positive only for methadone (which Ms. McAlister was being given at the drug treatment center). However, the record indicates that the two tests given on November 11 and November 16 were both falsified. Specifically, Ms. McAlister did not provide her own urine for these tests. This fact is evinced by a letter from the drug treatment clinic, and is also supported by the fact that the November 11 and November 16 samples contained no methadone. The absence of methadone, which Ms. McAlister was being given, proves that the urine provided was not her own.

Ms. McAlister's failure of the last two screens prior to the November 30 hearing is indicative of her behavior all along. Throughout the course of these proceedings, Ms. McAlister has been unable to complete any of the requirements put to her. She has haphazardly attended the required classes, she has not taken employment opportunities seriously, she has not procured housing or support independent of Mr. Williams. All of these failures can be traced to her inability to finally conquer her drug addiction. From the entire record, we conclude that there is clear and convincing evidence that Ms. McAlister has failed, despite reasonable efforts on the part of DCS, to substantially comply with the reasonable and necessary goals outlined in the permanency plans.

**Best Interests**

After a finding that the grounds for termination have been established by clear and convincing evidence, the court must then determine if termination is in the best interests of the child. T.C.A. § 36-1-113(c)(2). Section 36-1-113(i) (Supp. 2007) enumerates the following factors courts are to consider in making the best interests determination:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 Tenn.App. LEXIS 340, at *9 (Tenn. Ct. App. May 10, 2002).

-11-

Turning to the record, we find clear and convincing evidence that, despite numerous opportunities, Ms. McAlister has failed to effect permanent change in her life. She continues to use illicit drugs, and she has procured no employment. Consequently, she is still very much reliant upon others (specifically, Mr. Williams) to provide her with housing and necessaries. Because Ms. McAlister herself is a dependent (in her drug use and in her life generally), it is the opinion of this Court that she is neither able to care for these Children presently, nor in the foreseeable future. Furthermore, these Children have been in DCS custody for nearly three years. The evidence is that the Children are currently residing with foster parents who wish to adopt. Moreover, from the foster mother's testimony, it appears that continued contact with Ms. McAlister is creating problems for the older child (i.e. he is having difficulty with his studies, and is acting out at school). Given the fact that Ms. McAlister has not been able to make necessary changes in her life, much less demonstrate that such changes are permanent, we find that to prolong Ms. McAlister's involvement in these Children's lives will only function to keep the Children in a state of pendency. Consequently, we find that terminating Ms. McAlister's parental rights is in the best interests of these Children. So doing will allow them to integrate into a permanent and stable home where, hopefully, they will flourish.

Ms. McAlister raises two additional issues concerning the admission of certain evidence and the pendency of the maternal grandmother's petition for custody. We will address each of these issues for reversible error.

## Admission of Evidence

Ms. McAlister asserts that the trial court erred in allowing certain drug test results in the absence of affidavits or other evidence concerning the truth and reliability of these results. Specifically, Ms. McAlister's attorney objected, on grounds of hearsay, to the admission of various drug screens and annotations that were taken between the October 12 hearing and the continuation on November 30, *see supra*. We first note that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn.1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn.Ct.App.1995). The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives. *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn.Ct.App.2000). While we will set aside a discretionary decision if it does not rest on an adequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

Even if we assume, *arguendo*, that the trial court should not have allowed the drug tests and/or results during the period between hearing dates, as discussed above, the fact that Ms. McAlister was given the opportunity to submit to drug tests during this period was a lagniappe for her. As noted above, the relevant period for determining compliance with the permanency plans

would ordinarily be the period *before* the petition to terminate is filed. Turning to the record, Exhibits 1 and 2, results from drug screens given from February through April and July through August of 2006, were admitted without objection. In these screens, Ms. McAlister repeatedly tested positive for illicit drugs, including cocaine, benzopdiazepines, and marijuana. Furthermore, by her own testimony at the October 12 hearing, Ms. McAlister admitted to using un-prescribed Xanax and cocaine very recently. In short, there is clear and convincing evidence in the record that Ms. McAlister continued to use drugs, in dereliction of her responsibilities under the permanency plan, before the petition to terminate was filed. Consequently, even if we assume *arguendo* (which we do not) that the trial court's decision to allow the drug tests taken during the time between hearing dates was error, such error would be harmless because there is sufficient evidence in the record to clearly and convincingly prove that Ms. McAlister was using drugs during the relevant period before the petition to terminate her parental rights was filed.

**Maternal Grandmother's petition**

Ms. McAlister also asserts that it was reversible error for the trial court to continue with the termination proceedings while the Children's maternal grandmother's petition for custody was pending. We disagree. The fact that the grandmother, Ms. Ritchey, petitioned the court for custody of the Children has no bearing on whether Ms. McAlister's parental rights should be terminated. Regardless of the outcome of Ms. McAlister's hearing, as the trial court correctly notes, "[Ms. Ritchie] still has the right to petition for custody. It would be up to the referee or judge hearing the case to determine what is in the best interest of the children." Ms. Ritchey's petition has only to do with the placement of the children pending adoption, and this petition can proceed as an independent inquiry regardless of whether Ms. McAlister's parental rights are terminated. Therefore, we find that the trial court did not abuse its discretion, or otherwise err, in proceeding with the hearing on the petition to terminate Ms. McAlister's parental rights while Ms. Richey's petition was pending.

For the foregoing reasons, we affirm the order of the trial court terminating Ms. McAlister's parental rights to S.M.C. and K.C. Costs of this appeal are assessed against the Appellant, Leigh Ann McAlister, and her surety.

_____
W. FRANK CRAWFORD, JUDGE